B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS James Berman, Chapter 7 Trustee for the Substantively Consolidated Estate of Michael S. Goldberg, LLC and Michael S. Goldberg | DEFENDANTS Sally LaBonte, Sally LaBonte as Trustee of the Rev. Trust and the Dynasty Trust, Scott LaBonte, Scott LaBonte as Trustee of the Rev. Trust, Roland G. LaBonte, et. al. |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Zeisler & Zeisler, PC<br>10 Middle Street, 15th Floor<br>Bridgeport, CT  06604  203-368-4234 | ATTORNEYS (If Known)<br>Ross G. Fingold<br>Shipman Stokesbury & Fingold, LLC<br>20 Batterson Park, Farmington, CT  06032 |
| PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       □ Other<br>☒Trustee | PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       ☒Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Recovery of fraudulent transfers, Conn. Gen. Stat. Sections 52-552 et. seq. and alter ego

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $7,200,000.00 |
| Other Relief Sought<br>    See prayer for relief | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Michael S. Goldberg, LLC and Michael S. Goldberg | BANKRUPTCY CASE NO.<br>09-23370 | |
| DISTRICT IN WHICH CASE IS PENDING<br>    Connecticut | DIVISION OFFICE<br>Hartford | NAME OF JUDGE<br>ASD |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

*Stephen M. Kindseth*

| DATE<br><br>    May 31, 2014 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>    Stephen M. Kindseth |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re: | : Chapter 7 |
| | : |
| MICHAEL S. GOLDBERG, LLC, and | : Case No. 09-23370 (ASD) |
| MICHAEL S. GOLDBERG, | : Substantively Consolidated |
| | : |
| Debtors. | : |
| | : |
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE | : Adv. Proc. No. |
| SUBSTANTIVELY CONSOLIDATED ESTATE OF MICHAEL | : |
| S. GOLDBERG, LLC AND MICHAEL S. GOLDBERG, | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| SALLY A. LABONTE, TRUSTEE OF THE SCOTT A. | : |
| LABONTE DYNASTY TRUST; ROLAND G. LABONTE, | : |
| TRUSTEE OF THE SCOTT A. LABONTE DYNASTY TRUST; | : |
| SALLY A. LABONTE; DEVCON ENTERPRISES, INC.; | : |
| MARKETPLACE PORT ST. LUCIE, LP; RCZS LLC; | : |
| CAKEMAKER LLC; SCOTT A. LABONTE; SCOTT A. | : |
| LABONTE, TRUSTEE OF THE SCOTT A. LABONTE | : |
| REVOCABLE TRUST; AND SALLY A. LABONTE, TRUSTEE | : |
| OF THE SCOTT A. LABONTE REVOCABLE TRUST, | : |
| | : |
| Defendants. | : May 31, 2014 |
| | : |

## COMPLAINT

The Plaintiff, James Berman, Chapter 7 Trustee (the "Trustee") for the substantively

consolidated bankruptcy estates of the debtors Michael S. Goldberg, LLC d/b/a Acquisitions

Unlimited Group (the "Debtor LLC") and Michael S. Goldberg ("Goldberg") (sometimes, collectively, referred to hereinafter as the "Debtors"), alleges as follows:

## SUMMARY OF CAUSES OF ACTION

1.      This action seeks to recover millions of dollars' worth of property fraudulently transferred by the defendant, Scott A. LaBonte ("Scott LaBonte"), shortly before and at various times after being sued by the Trustee to recover approximately $7.2 million.  Scott LaBonte fraudulently transferred substantially all of his property both personally and from The Scott A. LaBonte Revocable Trust (the "Rev. Trust") to The Scott A. LaBonte Dynasty Trust (the "Dynasty Trust").  Scott LaBonte also fraudulently transferred his assets to or for the benefit of his wife, Sally A. LaBonte ("Sally LaBonte"), and to or for the benefit of certain other entities as more fully set forth herein.  This action further seeks to recover the subsequent transfers of such fraudulent transfers, including, but not limited to, transfers from the Dynasty Trust to Sally LaBonte personally or for her benefit, and to or for the benefit of certain entities including, but not limited to, RCZS, LLC ("RCZS"), Cakemaker LLC ("Cakemaker"), Devcon Enterprises, Inc. ("Devcon"), and Marketplace Port St. Lucie, LP ("Marketplace PSL").  Finally, the Trustee requests that this Court pierce the veil of the Dynasty Trust and determine it to be the alter ego of Scott LaBonte and hold the Dynasty Trust liable for the claims against Scott LaBonte including the claims held by the Trustee on behalf of the Debtors' bankruptcy estate.

2.      Scott LaBonte's conduct throughout these bankruptcy proceedings (including the transfers sought to be avoided by this action) has been calculated to hinder, delay and defraud the Trustee and the Debtors' bankruptcy estate by moving his assets beyond their reach and to then

2

conceal his fraudulent transfers from the Trustee and this Court. Upon learning of the very real

likelihood if not certainty that he would be sued by the Trustee to recover the money he received

from the Debtors' Ponzi scheme, Scott LaBonte transferred substantially all of his assets—

primarily composed of ownership interests in various entities—to the Dynasty Trust for no real

consideration. The Dynasty Trust provided what was essentially a sham promissory note in the

amount of $1,051,391—an amount, upon information and belief, far less than the actual value of

the ownership interests transferred—with interest only payments due at the rate of 4.30%

annually and the principal balance due in 30 years.

3.      Despite having transferred his ownership interests in these entities to the Dynasty

Trust, Scott LaBonte continued to exercise complete dominion and control over them and

directly receive the income they generated into his own personal bank account for his sole and

exclusive use. This continued until he was about to stipulate to a prejudgment remedy against

him in the Trustee's favor in the amount of $5 million.

4.      At this point in approximately January, 2011, Scott LaBonte began funneling the

income generated by these ownership interests through the Dynasty Trust's bank account.

Notwithstanding, in the years that followed, Scott LaBonte continued to exercise complete

dominion and control over the transferred ownership interests, all of the income they generated,

and the Dynasty Trust which he used to shield the fraudulently transferred assets from

attachment and later collection by the Trustee. At the same time, the income and, in some

instances, sale proceeds derived from such ownership interests continued to flow uninterrupted

for the personal benefit of Scott LaBonte and his wife, Sally Labonte.

3

**JURISDICTION, VENUE AND NATURE OF THIS PROCEEDING**

5.      On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtors.

6.      On November 24, 2009, the Court entered the Order for Relief in the Debtors' cases.

7.      By Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in both cases.

8.      On October 5, 2012, the Court entered its order substantively consolidating the Debtors' bankruptcy estates.

9.      This Complaint initiates an adversary proceeding to recover certain fraudulent transfers and related relief pursuant to the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552, et. seq., and Federal Rule of Bankruptcy Procedure 7001(1), and the to obtain a determination from this Court that the Dynasty Trust constitutes the alter ego of Scott LaBonte.

10.     This Court has jurisdiction, under 28 U.S.C. §§ 157 and 1334(b), over this proceeding because the claims asserted herein are related to a case pending under the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court").

11.     This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (H) and (O).

12.     Venue of this adversary proceeding in the Bankruptcy Court is proper pursuant to 28 U.S.C. § 1409(a) because the Debtors' cases are pending in this district and division.

4

## PARTIES

13.    The Trustee is the duly appointed Chapter 7 Trustee for the Debtors and has standing as Trustee.

14.    Defendant Sally LaBonte is an individual domiciled at 6 Lowell Road, Farmington, Connecticut, 06032.  Sally LaBonte is Scott LaBonte's wife, and is a trustee of the Rev. Trust and the Dynasty Trust.

15.    Sally LaBonte is named as a defendant personally and in her capacity as a trustee of the Rev. Trust and the Dynasty Trust.

16.    Defendant Scott LaBonte is an individual domiciled at 6 Lowell Road, Farmington, Connecticut, 06032.  Scott LaBonte is Sally LaBonte's husband, and is a trustee of the Rev. Trust.

17.    Scott LaBonte is named as a defendant personally and in his capacity as a trustee of the Rev. Trust.

18.    Defendant Roland G. LaBonte ("Roland LaBonte") is an individual domiciled at 195 Regatta Dr., Jupiter, Florida, 33477.  Roland LaBonte is Scott LaBonte's father and a trustee of the Dynasty Trust.

19.    Roland LaBonte is named as a defendant in his capacity as a trustee of the Dynasty Trust.

20.    Defendant RCZS is a limited liability company, which was organized and existed under the laws of the State of Connecticut, with its primary place of business located at 433 South Main Street, Suite 300, West Hartford, CT 06110.

5

21.    Defendant Cakemaker is a limited liability company, which was organized and existed under the laws of the State of Connecticut, with its primary place of business located at 433 South Main Street, Suite 300, West Hartford, CT 06110.

22.    Defendant Devcon is a corporation, organized and existing under the laws of the State of Connecticut, with its principal place of business located at 433 South Main Street, Suite 300, West Hartford, CT 06110.

23.    Defendant Marketplace PSL is a limited partnership, organized and existing under the laws of the State of Florida, with its principal place of business located at 433 South Main Street, Suite 300, West Hartford, CT 06110.

## FACTUAL BACKGROUND

### The Goldberg Scheme

24.    For 12 years, from 1997 to 2009, Goldberg ran a pure Ponzi scheme (the "Goldberg Scheme").

25.    The Goldberg Scheme promised (and, for a long time, paid) patently unbelievable rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter (when compounded, over 100% annually) in purportedly "risk-free" investments.

26.    Goldberg represented to investors that he and/or the Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Goldberg represented that he could purchase diamonds at extremely low wholesale prices on the New York City diamond exchange

and resell those diamonds for a profit sufficient to pay investors in these diamond liquidation

contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Deals").

27.    The second and more recent set of deals were based on Goldberg's

representations to potential investors that he was one of a handful of "preferred vendors" of

"Chase Manhattan Bank." This, itself, was a "red flag," because the institution has been publicly

known as JP Morgan Chase, N.A. ("Chase") since 2000 when Chase Manhattan Bank merged

with JP Morgan & Co.

28.    Goldberg purported to "explain" his astronomical rates of return by telling

investors that he had a contractual right to purchase foreclosed business assets (such as structural

steel, aluminum and other construction material) from a "Chase Foreclosure Manifest" at prices

low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to

large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset

Deals"). Goldberg told investors that his relationship with Chase was governed by a 1999

contract between the Debtor LLC and Chase that had been updated from time-to-time (the

"Chase Master Agreement").

29.    Goldberg represented to investors that the Chase Asset Deals involved pre-

arranged sales to major public companies, such as Ford, United Technologies Corporation,

Bechtel Corporation, Bausch and Lomb, Swinerton Builders, and others.

30.    Goldberg also made the fantastical representation to investors that the Chase

Asset Deals were "risk-free," because the purported Chase Master Agreement contained a

"Contract Dissolution Capital Protection Clause" which obligated Chase to repurchase the

foreclosed business assets for the full amount of the purchase price if the Debtor was unable to re-sell the acquired assets to the expected ultimate buyer for any reason.

31.    In contrast to the more complex fraudulent schemes employed in many well-known Ponzi schemes, such as those perpetrated by Bernard Madoff, Scott Rothstein, Mark Dreier and the Bayou Fund, the Goldberg Scheme did not involve any legitimate or actual business or investment activity by the Debtors. All of the funds used to pay investors came from other investors.

32.    The Debtors' Diamond Deals and Chase Asset Deals were a complete sham. The Debtors never bought diamonds or foreclosed assets with investor funds and never sold anything to the purported third-party "buyers." No "profits" or other income or proceeds were generated by any transactions involving the Debtors. All of the funds received from investors went to either pay off other investors or for Goldberg's personal use or benefit.

33.    There was no reasonable basis for investors to believe Goldberg's returns were legitimate or his representations were truthful. First and foremost, the returns themselves, on any basis, let alone risk-free, were patently incredible. In addition, Goldberg was not, and had never been, a licensed investment advisor, had no financial training and was employed, on a full-time basis, as a medical device sales representative. Moreover, the documents utilized by Goldberg in his "deals" are replete with typos, ambiguous language, erroneous information and other, additional "red flags" that should have put even the most unsophisticated investors on notice that they might be dealing with a con artist. The fact that Goldberg appeared to be able to generate a seemingly limitless number of Diamond Deals and Chase Asset Deals (deals that

8

strain credulity in isolation and which taken together appear totally ludicrous) also should have alerted investors to the fraudulent nature of the Goldberg Scheme.

34.     As word of these fantastic returns on virtually risk-free investments spread, increasing numbers of investors wanted "in" on the Goldberg Scheme. More significantly, the Debtors, knowingly and unknowingly, began compensating individuals and companies who brought investors to the Goldberg Scheme in return for a percentage of the investment dollars they generated ("Feeders").

35.     The increased investment activity in the Goldberg Scheme (between the early 2000s and 2007) was due, in part, to the Feeders' strong incentive to bring larger and larger deals to Goldberg. The Feeders were risking other people's money while "earning" a 2 percent (2%) to 5 percent (5%) participation rate plus, in some instances, a finder's fee of up to twenty percent (20%) on the investments made by their clients. The increased investments generated by the Feeders caused the size of the Goldberg Scheme to explode between 2007 and 2009 to involve over one hundred thirty million ($130,000,000) dollars in transactions and resulted in over one hundred investors holding the bag for over $30 million in losses.

36.     Scott LaBonte was both an investor in, and a Feeder to, the Goldberg Scheme. Scott LaBonte brought numerous investors and millions of dollars to the Goldberg Scheme.

37.     In mid-to-late 2009, more and more large investors began demanding full payment on the due dates of their contracts, instead of "rolling them over." At this point, the Goldberg Scheme became increasingly difficult to maintain. Goldberg began making later and later payments while he tried to find replacement investors to pay off those investors who were

9

demanding money. These late payments created additional concerns among large investors who already knew that the Goldberg Scheme provided patently unreasonable rates of return and had ample reason to fear the worst in terms of Goldberg's bona fides. Accordingly, these large investors put Goldberg under increasing pressure.

38.    In the Fall of 2009, Goldberg was sued and his assets were frozen by a group of large investors whose recently invested millions had not been returned when due. At this point in October, 2009, Goldberg turned himself in to federal authorities.

39.    On or about November 16, 2009, Goldberg admitted to federal law enforcement officials that his sole source of payment to investors was with the funds obtained from other investors. On September 13, 2010, Goldberg entered a plea of guilty to federal wire fraud charges in connection with his operation of the Goldberg Scheme pursuant to the plea agreement he reached. In this plea agreement, Goldberg admitted:

> In fact, and as the defendant well knew, each and every one of the defendant's representations were false: aside from during the first six months of his scheme, the defendant did not purchase diamonds in New York City or any other location; the defendant did not have any relationship, contractual or otherwise, with Chase; the defendant did not purchase any foreclosed and seized assets from Chase, nor did he resell any foreclosed and seized assets. In truth and in fact, the defendant paid the promised returns to existing investors with funds he received from new investors or reinvested funds.

40.    On May 16, 2011, the Honorable Robert N. Chatigny, United States District Judge for the District of Connecticut, sentenced Goldberg to a term of imprisonment of 120 months and imposed an order of restitution in the amount of $31,023,035.40.

**Edward Malley: Investor and Feeder**

41.     In approximately 2004, Scott LaBonte's cousin, Edward Malley ("Malley"), a resident of Wethersfield, Connecticut, learned of the Goldberg Scheme from family members who lived near Goldberg and had been investing with him.

42.     In approximately 2005, Malley began investing in the Goldberg Scheme.

43.     Malley repeatedly invested in the Goldberg Scheme even after both his attorney and accountant advised him that Goldberg's promise (set forth in their investment agreements) that he would pay Malley's (and other investors') tax obligations on their investment returns could not possibly be legal or true.

44.     Malley never questioned Goldberg regarding the issue of how taxes were paid on his deals; never saw any of the purported equipment that Goldberg bought and sold; and never received any independent verification that the Chase Assets Deals actually existed.  In addition, Malley never questioned Goldberg regarding the seemingly limitless supply of investment deals paying annualized returns in excess of 100% on almost identical 90-day terms.

45.     Moreover, Malley ignored obvious "red flags" in Goldberg's documentation with his investors and, more importantly, with Chase.  These documents were so amateurish and riddled with errors that even the most unsophisticated investor should have been concerned about Goldberg's bona fides and the potential for fraud.  Malley also ignored the advice of his attorney and his accountant, both of whom had questioned the legality of certain aspects of the Goldberg Scheme.

46.     From 2005 to 2009, Malley typically earned a return of 20% to 25% per quarter on his investments in the Goldberg Scheme.

11

47.    After his initial investments, Malley invested in the Goldberg Scheme by sending funds to and receiving funds from the Debtor LLC, via the IOLTA account of his attorney, Kablik & Leary, P.C., a Connecticut law firm located in Berlin, Connecticut and its principal, Jon C. Leary, Esq. (hereinafter, "K&L" and "Leary" and, as to the IOLTA account, the "K&L IOLTA Account").

48.    In order to increase his profits from the Goldberg Scheme, Malley became a Feeder. Malley maximized his profits by obtaining funds from other individuals (Scott LaBonte being one) and investing those funds with the Debtors, and then paying these sub-investors somewhat lower rates of return than that paid to Malley. Malley's sub-investors' returns, however, were still "incredible" by any reasonable standard.

49.    From at least 2007 through 2009, Malley used the K&L IOLTA Account as a clearinghouse to facilitate investments in the Debtor LLC and to distribute returns to Mr. LaBonte and other investors.

50.    Between 2008 and 2009, over $14 million was transferred from the Debtors to Malley, Scott LaBonte and others through the K&L IOLTA Account.

**Scott LaBonte: Investor and Feeder**

51.    Scott LaBonte is a sophisticated businessman, investor and a commercial real estate developer.

52.    Malley told Scott LaBonte about investment opportunities available in the Goldberg Scheme, and described the business model that Goldberg had described to Malley:

12

that Goldberg would acquire foreclosed assets from Chase Manhattan Bank and sell them to other companies.

53.    Malley told Scott LaBonte the same story that Goldberg had told Malley:  that Goldberg had the ability to acquire assets from Chase Manhattan Bank at a substantial discount below their fair market value as a result of his relationship with a former college friend employed by Chase Manhattan Bank.

54.    Scott LaBonte began investing in the Debtors, through Malley, in late 2005 or early 2006.

55.    According to Scott LaBonte, he invested in the Goldberg Scheme by providing cash to Malley in exchange for promissory notes issued by Malley (the "Malley Notes").  All of the Malley Notes expressly required that the money "loaned" to Malley by Scott LaBonte had to be invested in the Goldberg Scheme and nowhere else.

56.    According to Scott LaBonte, he invested in the Debtors through Malley, rather than directly, solely because Malley had the relationship with Goldberg and Scott LaBonte did not.

57.    Scott LaBonte did almost no due diligence concerning the Debtors before investing in the Goldberg Scheme.

58.    At the time he began investing in the Goldberg Scheme "through" Malley, Scott LaBonte had never lent money to Malley.  Scott LaBonte never asked Malley for a financial statement or a tax return before he invested in the Debtors through the Malley Notes.

13

59.     Malley told Scott LaBonte, and Scott LaBonte understood, that the K&L IOLTA Account was used to collect funds directly for investment with the Debtors and to distribute funds from the Debtors.

60.     Between January 15, 2008 and May 20, 2009, $7,241,797.52 was transferred from the Debtors, through the K&L IOLTA Account, to Scott LaBonte, some of which was used by Malley to acquire interests in various limited liability companies owned and/or managed by Scott LaBonte after Scott LaBonte decided that he no longer wanted to invest with the Debtors due, in part, to the Debtors' inability to return principal and pay (false) profits in a timely manner.

61.     Scott LaBonte never asked for, and Goldberg never gave Scott LaBonte, directly or indirectly, any financial statements, tax returns, contact information concerning Goldberg's accountant, any information from Goldberg's accountant, contact information concerning Goldberg's lawyer, or any information from his lawyer.

62.     From inception, Scott LaBonte knew that Goldberg was claiming to be able to obtain returns for himself on the Chase Manhattan Bank deals of well in excess of one hundred (100%) percent per annum.

63.     Scott LaBonte never showed the Goldberg Scheme documents to, nor solicited professional investment advice regarding the Goldberg Scheme from, his accountants or lawyers.

64.     At the advice of his accountant, Scott LaBonte chose to insert choice-of-law provisions into the Malley Notes adopting Nevada law as the law governing the notes in order to evade what he believed would be a violation of Connecticut's usury laws.

14

65.    Scott LaBonte typically delivered the funds he invested in the Goldberg Scheme directly into the K&L IOLTA Account, and received his returns of "capital" and "profit" through that same account, with the money never touching Malley's hands.

66.    Scott LaBonte demanded immediate payments of funds from the Goldberg Scheme through the K&L IOLTA Account, however, the Goldberg Scheme paid such funds to Scott LaBonte on a delayed basis.

**Scott LaBonte Knew or Strongly Suspected that the Trustee Would Sue Him To Recover the Millions of Dollars He Received from the Goldberg Scheme**

67.    Michael Goldberg turned himself into authorities in October, 2009.

68.    Shortly after it was publically announced in November, 2009, Scott LaBonte learned from his cousin, Malley, that Michael Goldberg was "a crook" and that Michael Goldberg had been running a Ponzi scheme.

69.    Following the commencement of the bankruptcy cases, the entry of the orders for relief, and the appointment of the Trustee all in November, 2009, the Trustee commenced an adversary proceeding (the "Adversary Proceeding") against K&L and Malley on May 14, 2010, seeking, among other things, to recover over $14 million in fraudulent transfers made by the Debtors from the Goldberg Scheme to Malley.

70.    Scott LaBonte admitted during his subsequent deposition that "shortly after" Malley was served, Malley told Scott LaBonte that the Trustee had sued him.

71.    Malley had been served by service of process upon his attorney who had agreed to accept service on his behalf, on May 21, 2010.

72. No later than this time in May, 2010, Scott LaBonte knew or strongly suspected that the Trustee would uncover his investments in the Goldberg Scheme, including the Malley Notes, the amounts that he received from the K&L IOLTA Account, and his role as a Feeder.

73. No later than this time in May, 2010, Scott LaBonte knew or strongly suspected that the Trustee's discovery of such transactions and conduct would cause the Trustee to bring an action against him to recover the millions of dollars that he had received from the Goldberg Scheme.

74. No later than this time in May, 2010, Scott LaBonte knew or strongly suspected that his property including his property held in the Rev. Trust were vulnerable to the claims held by and the remedies available to the Trustee.

75. The Rev. Trust is revocable by Scott LaBonte during his lifetime and Scott LaBonte was a settlor, a trustee, and a beneficiary of the Rev. Trust. Accordingly, at all times relevant herein, the assets held in the Rev. Trust constitute property of Scott LaBonte.

**Scott LaBonte's Assets Prior To His Fraudulent Transfers**

76. Upon information and belief, on or about May 20, 2009, Scott LaBonte provided his personal Statement of Financial Condition, compiled by his accountant, to New Alliance Bank in connection with the extension of a line of credit.

77. Scott LaBonte's May 20, 2009 Statement of Financial Condition stated that he owned assets having an aggregate value of $13,138,000. These assets included $2,500,000 in cash (and, presumably, cash equivalents) and $7,568,000 in real estate and business interests.

78. After listing a mortgage liability in the amount of $3 million, the May 20, 2009 Statement of Financial Condition represented that Scott LaBonte's net worth was $10,138,000.

79. Upon information and belief, one year later in May, 2010, and at the time he learned about the Trustee's Adversary Proceeding against his cousin, Scott LaBonte continued to own the same real estate and business interests reflected in his May 20, 2009 Statement of Financial Condition.

80. In the years leading up to and through 2010, Scott LaBonte's real estate and business interests and other assets produced substantial cash for his personal benefit. For example, Scott LaBonte realized approximately $4 million in cash flow from his assets in 2009, and approximately $2 million in cash flow from his assets in 2010.

**Scott LaBonte Fraudulently Transfers Substantially All of His Assets to the Dynasty Trust**

81. Commencing in approximately May, 2010, after coming to the realization that he almost certainly would be sued by the Trustee for millions and millions of dollars, Scott LaBonte began to orchestrate the fraudulent transactions that would attempt to shield substantially all of his assets from the claims held by and remedies available to the Trustee. His plan was to assign virtually all of his ownership interests in various entities to the Dynasty Trust in exchange for a promissory note. The principal amount of the note would be based on an artificially low valuation blessed by his accountant. The note would require interest only annually at the lowest legal rate, and would only be payable decades in the future (so the balanced owed effectively could not be recovered by his creditors). He would retain complete control over the subject entities and the income they produced through his management company, Devcon, and his

17

ability to dominate and control the trustees of the Dynasty Trust: his wife, his father and his and his family's accountant for 30 to 35 years. Notwithstanding the Trustee's collection efforts, Scott LaBonte's financial affairs would not be impacted in the least (so he hoped) because he would continue to personally receive the income and sale proceeds derived on account of his transferred ownership interests and such amounts would, by his accountant, be credited against the balance due him on the promissory note from the Dynasty Trust. Scott LaBonte implemented this fraudulent scheme and the resulting fraudulent transactions should be avoided and their proceeds recovered for the benefit of this bankruptcy estate.

82.    Scott LaBonte's wife, Sally LaBonte, father, Roland LaBonte, and long-time accountant, Joseph W. Sparveri, Jr. ("Sparveri") were in June, 2010, the trustees of the Dynasty Trust.

83.    In or about June, 2010, Scott LaBonte began the process of having the paperwork prepared to transfer the vast majority of his ownership interests in various entities (both held personally by him and by his Rev. Trust) to the Dynasty Trust.

84.    To create the false impression that such transfers had been made in exchange for fair consideration, Scott LaBonte undertook to prepare a "valuation" of his ownership interests.

85.    Accordingly, in or around June, 2010, Scott LaBonte's accountant, following Scott LaBonte's instructions, produced a valuation concerning the various ownership interests based solely upon an income capitalization approach. Significantly, the accountant relied upon Scott LaBonte to provide a critical component in the valuations: the appropriate capitalization rate for each property.

18

86.    Based upon the accountant's calculation using the capitalization rates provided by Scott LaBonte, Sparvari represented that the value of Scott LaBonte's interests equaled, collectively, $1,168,214. This amount was far less than their true fair market value and far less than their value as set forth in the May 20, 2009 Statement of Financial Condition created by the same accountant only one year earlier.

87.    For example, Sparvari's May 20, 2009, valuation represented that Scott LaBonte's 20% interest in Devcon Manchester, LLC equaled $348,520, but as of June 2, 2009, Sparvari gave it zero value. Sparvari also valued Scott LaBonte's 35% interest in Devcon Fairhaven, LLC at $888,000 as of May 20, 2009, and only $167,933 a year later, as of June 2, 2010.

88.    After providing the Dynasty Trust with a "gift" to the extent of 10% of the "value" of each equity interest being transferred, Scott LaBonte derived the amount of $1,051,391 as the purported "consideration" to be paid for the equity interests he intended to transfer to the Dynasty Trust.

89.    Scott LaBonte then caused a promissory note to be prepared to evidence the "consideration" paid—the promise to pay the amount of $1,051,391—once again attempting to create the false appearance of legitimacy.

90.    To further hinder the efforts of the Trustee and other creditors to recover against him, in preparing the promissory note, Scott LaBonte caused it to provide that the principal balance would only be due in 30 years. The promissory note accrued interest at the lowest rate permissible by federal tax regulations and such interest was payable annually.

19

91.    Scott LaBonte then coordinated the actual transfer documents.  His counsel prepared a series of Assignment, Assumption and Consent Agreements (the "Assignment Agreements") for each of the entities to be transferred to the Dynasty Trust.

92.    Upon information and belief, the documents to effectuate the fraudulent transfers had not been prepared until mid-July, 2010.

93.    At that time, Scott LaBonte personally, and as trustee of the Rev. Trust, along with his wife, Sally LaBonte, as a trustee of the Rev. Trust, executed the Assignment Agreements effectuating the transfer of his ownership of the following interests (collectively, the "Fraudulently Transferred Interests") in the corresponding entities to the Dynasty Trust (collectively, the "Scott LaBonte/Dynasty Trust Transfers"):

| **Entity** | **Interest Transferred** |
| --- | --- |
| Devwest, LLC, a Massachusetts limited liability company | 50% interest |
| SAL NH Investments LLC, a Connecticut limited liability company | 34.69999% interest |
| SAL NH Investments LLC, a Connecticut limited liability company | .00001% interest |
| SAL Cranston LLC, a Rhode Island limited liability company | 27.2727% interest |
| SAL East Haven LLC, a Connecticut limited liability company | 15% interest |
| SAL North Haven LLC, a Connecticut limited liability company | 30% interest |
| Devcon Shops, LLC, a Massachusetts limited liability company | 25.0450% interest |
| Devcon Fairhaven LLC, a Connecticut limited liability company | 35% interest |
| Devcon Berdon LLC, a Connecticut limited liability company | 50% interest |
| Devcon Manchester, LLC, a Connecticut limited liability company | 19.5% interest |

20

| | |
|---|---|
| Devman LLC, a Connecticut limited liability company | 50% interest |
| Devcon Commons, LLC, a Connecticut limited liability company | 29.5% interest |
| Devfresh LLC, a Connecticut limited liability company | 50% interest |
| RSC Gilford, a New Hampshire limited liability company | 39.5% interest |
| Marketplace PSL | 29.7% interest |
| Marketplace Development Corp., a Florida corporation | 100 shares common capital stock |
| Devford, LLC, a New Hampshire limited liability company | 50 percent interest |
| Devcon | 10 shares of Class A Voting Common Capital Stock and 100 shares of Class B Non-Voting Common Capital Stock |

94.   At or about that time in July, 2010, the trustees of the Dynasty Trust, Sally LaBonte, Roland LaBonte, and Sparveri, executed the Assignment Agreements on behalf of the Dynasty Trust, at the direction and subject to the control of Scott LaBonte.

95.   At or about that time in July, 2010, the trustees of the Dynasty Trust, Sally LaBonte, Roland LaBonte, and Sparveri, executed the promissory note in the amount of $1,051,391 on behalf of the Dynasty Trust, at the direction and subject to the control of Scott LaBonte.

96.   Even though the promissory note and Assignment Agreements were actually executed in mid to late July, 2010, they each stated that they were dated "as of June 2, 2010."

**The Transfers to the Dynasty Trust Rendered Scott LaBonte Insolvent**

97.    The Scott LaBonte/Dynasty Trust Transfers rendered Scott LaBonte insolvent.

98.    Scott LaBonte's accountant Sparveri prepared a financial statement for Scott LaBonte as of June 2, 2010.

99.    The June 2, 2010 financial statement reflected that Scott LaBonte no longer owned any of the Fraudulently Transferred Interests (transferred effective as of June 2, 2010).

100.    As a result, after valuing his remaining assets (even including the promissory notes due from the Dynasty Trust at full value despite not being due for 30 years), Scott LaBonte was left with a negative net worth of $1,381.000 (in stark contrast to the net worth of $10,138,000 million Scott LaBonte had a year earlier).

**Scott LaBonte Retained Control Over the Fraudulently Transferred Assets**

101.    Scott LaBonte retained complete domination and control over the Fraudulently Transferred Interests, the income they generated, and, at times, the sales proceeds derived on their account notwithstanding the Assignment Agreements conveying them to the Dynasty Trust.

102.    As President and Chief Executive Officer of Devcon, Scott LaBonte continued to manage the affairs and accounts of the subject entities, including the determination of whether distributions should be made to their equity holders and, with respect to the Fraudulently Transferred Interests, to whom such distributions should be paid.

103.    For the months from June through December, 2010, Scott LaBonte caused each of the monthly distributions due on account of the Fraudulently Transferred Interests to be deposited into his personal account with Bank of America even though those interests had purportedly been assigned to the Dynasty Trust.

22

104.    At various times during this time frame from approximately June through February, 2011, Scott LaBonte made transfers to or for the benefit of his wife, Sally LaBonte, using distributions he received on account of the Fraudulently Transferred Interests, (collectively, the "Scott LaBonte/Sally LaBonte Transfers"), including, but not limited to, numerous payments made on account of the personal obligations incurred by Sally LaBonte.

105.    At various times during this time frame from approximately June through February, 2011, Scott LaBonte made transfers to or for the benefit of entities that he controlled or held an interest in or that the Dynasty Trust held an interest in, (collectively, the "Scott LaBonte/Entity Transfers") including, but not limited to, the following paid from his personal account with Bank of America:

a.    Check written on June 20, 2010, to RCZS in the amount of $9,000.00;

b.    Check written on June 20, 2010, to Devcon Enterprises, Inc. in the amount of $5,152.77;

c.    Check written on July 20, 2010, to "DEI" (Devcon) in the amount of $7,083.33;

d.    Check written on July 20, 2010, to "DEI" (Devcon) in the amount of $6,000.00;

e.    Check written on September 9, 2010, to Devcon Enterprises, Inc. in the amount of $57,319.44;

f.    Check written on September 9, 2010 to "DEI" (Devcon) in the amount of $153.74;

g.    Check written on September 9, 2010 to FIA Card Services in the amount of $133,890.75;

23

h.     Check written on September 20, 2010, to RCZS in the amount of $6,100.00;

i.     Check written on October 4, 2010, to Devcon Enterprises, Inc. in the amount of $6,977.08;

j.     Check written on October 6, 2010, to RCZS in the amount of $13,900.00;

k.     Check written on November 15, 2010, to RCZS, LLC in the amount of $15,000.00;

l.     Check written on November 29, 2010, to Devcon Enterprises, Inc. in the amount of $100,000.00;

m.     Check written on December 10, 2010, to Devcon Enterprises, Inc. in the amount of $5,150.17;

n.     Check written on December 10, 2010, to Devcon Enterprises, Inc. in the amount of $7,136.45;

o.     Check written on December 15, 2010, to RCZS LLC in the amount of $8,000.00;

p.     Check written on January 7, 2011, to Devcon Enterprises, Inc. in the amount of $3,000.00;

q.     Check written on January 14, 2011, to RCZS in the amount of $9,000.00;

r.     Check written on January 14, 2011, to Devcon Enterprises, Inc. in the amount of $4,674.99; and

s.     Check written on January 19, 2011, to RCZS in the amount of $4,670.84.

**The Trustee's Pursuit of Scott LaBonte**

106.    During the course of discovery undertaken in advance of a hearing on the Trustee's Motion for a Prejudgment Remedy attachment of Malley's and K&L's assets, it became clear to the Trustee (as Scott LaBonte certainly knew the Trustee would eventually discover) that Scott LaBonte had acted as both investor in, and Feeder to, the Goldberg Scheme, and that he had received approximately $7.2 million from the Goldberg Scheme that could be recovered by the Trustee for the benefit of the Debtors' bankruptcy estates and their creditors.

107.    On November 12, 2010, the Trustee filed his Amended Complaint adding, inter alia, Scott LaBonte and various limited liability companies owned and/or controlled by Scott LaBonte as defendants in the Adversary Proceeding in order to avoid and recover fraudulent transfers made to them by the Debtors.

108.    On November 12, 2010, the Trustee filed a Motion for Prejudgment Remedy against Scott LaBonte in which the Trustee sought a prejudgment remedy attachment of Scott LaBonte's assets in the amount of $7,241,797.52 (the "PJR Motion").

109.    On February 7, 2011, during the course of the hearing on the Trustee's PJR Motion, Scott LaBonte stipulated to the entry of a prejudgment remedy against him in the amount of $5,000,000.

110.    On February 10, 2011, the Bankruptcy Court issued its Prejudgment Remedy Order by Stipulation as to Defendant Scott LaBonte pursuant to which it entered a $5,000,000 prejudgment remedy against Scott LaBonte (the "PJR Attachment") and ordered him to provide sworn financial disclosures to the Trustee.

25

**The Fraudulent Transfers from the Dynasty Trust**

111.    In January of 2011, after the Trustee filed the PJR Motion to attach Scott
LaBonte's assets and shortly before Scott LaBonte stipulated to the entry of the PJR Attachment
with respect to his assets, Scott LaBonte began depositing the income generated by the
Fraudulently Transferred Interests into the Dynasty Trust's bank account (rather than his
personal account which he had done previously).

112.    In the following years, from January, 2011, until December, 2013, at the direction
of Scott LaBonte, millions and millions of dollars have been deposited into the financial account
held by the Dynasty Trust (the "Dynasty Account").

113.    For the year 2011, the Dynasty Account received additions totaling $1,119,076
and made withdrawals totaling $1,139,458.

114.    For the year 2012, the Dynasty Account received additions totaling $2,058,263
and made withdrawals totaling $2,065,541.

115.    For the year 2013, the Dynasty Account received additions totaling $2,376,488
and made withdrawals totaling $2,115,151.

116.    Scott LaBonte exercised complete dominion and control over the Dynasty
Account in the use of its funds and otherwise.

117.    During this time frame from January, 2011, until December, 2013, Scott LaBonte
personally directed or oversaw all deposits made into the Dynasty Account.

118.    Upon information and belief, for the vast majority of checks written during this time frame, Scott LaBonte personally drafted each check including the payee and the amount to be paid. He then presented the check to his wife for her signature, which she signed.

119.    With extremely limited exception, Sparvari had no role in each decision to make any payments from the Dynasty Account.

120.    Upon information and belief, Roland LaBonte had no role in the decision to make any payments from the Dynasty Account.

121.    The trustees for the Dynasty Trust completely disregarded the trust form as dictated by the operative trust documents, and their fiduciary and other obligations due the Dynasty Trust and its beneficiaries. The trustees exercised no independent judgment and engaged in acts on behalf of the Dynasty Trust based solely upon the direction of Scott LaBonte.

122.    In the process, Scott LaBonte was able to use the Dynasty Trust to hold his assets beyond the reach of the Trustee and his other creditors while continuing to use them for his personal benefit and the benefit of his wife.

123.    At various times during this time frame from approximately January, 2011, through the present, Scott LaBonte caused the Dynasty Trust to make transfers to or for the benefit of his wife, Sally LaBonte, using the proceeds the Dynasty Trust received on account of the Fraudulently Transferred Interests or otherwise, (collectively, the "Dynasty Trust/Sally LaBonte Transfers") including, but not limited to, the following paid from the Dynasty Account:

a.    A check written on July 9, 2012, to Sally LaBonte, in the amount of $200,000.00;

    b.    A check written on July 23, 2012, to Sally LaBonte, in the amount of

$100,000.00;

    c.    A check written on October 25, 2013, to Sally LaBonte, in the amount of

$400,000.00; and

    d.    A check written on November 14, 2013, to Sally LaBonte, in the amount of

$50,000.00.

    124.    At various times during this time frame from approximately January, 2011,

through the present, Scott LaBonte caused the Dynasty Trust to make transfers to or for the

benefit of entities that he controlled or held an interest in or that the Dynasty Trust held an

interest in, (collectively, the "Dynasty Trust/Entity Transfers") including, but not limited to, the

following:

    a.    A check written on February 3, 2012, to RCZS in the amount of $243,000.00;

    b.    A check written on May 18, 2012, to Cakemaker in the amount of $200,000.00;

    c.    A check written on April 16, 2012, to Devcon, in the amount of $13,726.15;

    d.    A check written on May 4, 2012, to Devcon, in the amount of $300,000.00; and

    e.    A check written on April 24, 2012, to Marketplace PSL, in the amount of

$116,000.00.

**The Final Component:  Credits Against the Promissory Note**

    125.    In a transparent attempt to bolster the false impression that the transfers between

him, his wife, his entities and the Dynasty Trust had been bone fide, Scott LaBonte directed

Sparvari to prepare schedules that purported to apply "credits" on the "debt" owed by the

Dynasty Trust to the Rev. Trust under the promissory note for the amounts that he had used from the Dynasty Account.

126.    The years of expenses and other amounts paid by Scott LaBonte from the Dynasty Account and the years of transfers to various entities were applied in payment of the balance owed by the Dynasty Trust on account of the Fraudulently Transferred Interests.

127.    Such structure served two fraudulent purposes.  First, it provided cover against the obvious conclusion that Scott LaBonte had simply transferred his assets beyond the reach of his creditors and retained exclusive control over them for his personal use, which he actually realized over years.  Second, it accelerated the payment of the promissory note and thereby quickly diminished an asset that could have otherwise been collected (possibly) by Scott LaBonte's creditors.

128.    Regardless of such machinations, in the end, the transactions orchestrated by Scott LaBonte constitute fraudulent transfers avoidable by the Trustee.

### First Claim for Relief (Intentional Fraudulent Transfer by Scott LaBonte Pursuant to Conn. Gen. Stat. § 52-552e(a)(1))

129.    The Trustee held a claim against Scott LaBonte as that term is defined in Conn. Gen. Stat. § 52-552b(3), and such claim arose before the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers, and the Scott LaBonte/Entity Transfers were made.

130.    Scott LaBonte made the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers, and the Scott LaBonte/Entity Transfers with the actual intent to hinder, delay or defraud his creditors including the Trustee.

29

131. The Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers, and the Scott LaBonte/Entity Transfers constitute fraudulent transfers in violation of Conn. Gen. Stat. § 52-552e(a)(1).

132. Pursuant to Conn. Gen. Stat. § 52-552h(a), the Trustee may obtain (1) the avoidance of the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers and the Scott LaBonte/Entity Transfers to the extent necessary to satisfy the Trustee's claim against Scott LaBonte; (2) an attachment or other provisional remedy against the assets transferred or other property of the transferees; (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure (A) an injunction against further disposition by the Scott LaBonte or the transferees, or both, of the assets transferred or of other property, (B) appointment of a receiver to take charge of the assets transferred or of other property of the transferees, or (C) any other relief the circumstances may require.

133. Pursuant to Conn. Gen. Stat. § 52-552i(b), to the extent that the conveyance of the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers, and the Scott LaBonte/Entity Transfers are voidable in this action by the Trustee, the Trustee may recover judgment for the value of the assets transferred or the amount necessary to satisfy the Trustee's claim against Scott LaBonte, whichever is less, against (1) the first transferee of the asset or the person for whose benefit the transfer was made, including, but not limited to, the defendants, Sally LaBonte, Devcon, and RCZS, or (2) any subsequent transferee, including, but not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL, in

connection with the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity

Transfers.

### Second Claim for Relief (Constructive Fraudulent Transfer by Scott LaBonte Pursuant to Conn. Gen. Stat. § 52-552e(a)(2))

134.    The Trustee held a claim against Scott LaBonte as that term is defined in Conn.

Gen. Stat. § 52-552b(3) and such claim arose before the Scott LaBonte/Dynasty Trust Transfers,

the Scott LaBonte/Sally LaBonte Transfers, and the Scott LaBonte/Entity Transfers were made.

135.    Scott LaBonte did not receive reasonably equivalent value in exchange for the

Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers or the Scott

LaBonte/Entity Transfers.

136.    The Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte

Transfers or the Scott LaBonte/Entity Transfers were made at a time when (A) Scott LaBonte

was engaged in, or was about to engage in, a business or transaction for which the remaining

assets of Scott LaBonte were unreasonably small in relation to the business or transaction; and/or

(B) Scott LaBonte intended to incur, or believed or reasonably should have believed that he

would incur debts beyond his ability to pay as they became due.

137.    The Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte

Transfers or the Scott LaBonte/Entity Transfers constitute fraudulent transfers within the

meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(2).

138.    Pursuant to Conn. Gen. Stat. § 52-552h(a), the Trustee may obtain (1) the

avoidance of the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte

31

Transfers and the Scott LaBonte/Entity Transfers to the extent necessary to satisfy the Trustee's

claim against Scott LaBonte; (2) an attachment or other provisional remedy against the assets

transferred or other property of the transferees; (3) subject to applicable principles of equity and

in accordance with applicable rules of civil procedure (A) an injunction against further

disposition by the Scott LaBonte or the transferees, or both, of the assets transferred or of other

property, (B) appointment of a receiver to take charge of the assets transferred or of other

property of the transferees, or (C) any other relief the circumstances may require.

139.    Pursuant to Conn. Gen. Stat. § 52-552i(b), to the extent that the conveyance of the

Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers, and the

Scott LaBonte/Entity Transfers are voidable in this action by the Trustee, the Trustee may

recover judgment for the value of the assets transferred or the amount necessary to satisfy the

Trustee's claim against Scott LaBonte, whichever is less, against (1) the first transferee of the

asset or the person for whose benefit the transfer was made, including, but not limited to, the

defendants, Sally LaBonte, Devcon, and RCZS, or (2) any subsequent transferee, including, but

not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL, in

connection with the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity

Transfers.

**Third Claim for Relief (Constructive Fraudulent Transfer by Scott LaBonte**
**Pursuant to Conn. Gen. Stat. § 52-552f(a))**

140.    The Trustee held a claim against Scott LaBonte as that term is defined in Conn. Gen. Stat. § 52-552b(3) and such claim arose before the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers, and the Scott LaBonte/Entity Transfers were made.

141.    Scott LaBonte did not receive reasonably equivalent value in exchange for the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers or the Scott LaBonte/Entity Transfers.

142.    Scott LaBonte was insolvent at the time of or became insolvent as a result of the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers or the Scott LaBonte/Entity Transfers.

143.    The Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers or the Scott LaBonte/Entity Transfers constitute fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552f(a).

144.    Pursuant to Conn. Gen. Stat. § 52-552h(a), the Trustee may obtain (1) the avoidance of the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers and the Scott LaBonte/Entity Transfers to the extent necessary to satisfy the Trustee's claim against Scott LaBonte; (2) an attachment or other provisional remedy against the assets transferred or other property of the transferees; (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure (A) an injunction against further disposition by the Scott LaBonte or the transferees, or both, of the assets transferred or of other property, (B) appointment of a receiver to take charge of the assets transferred or of other property of the transferees, or (C) any other relief the circumstances may require.

33

145.    Pursuant to Conn. Gen. Stat. § 52-552i(b), to the extent that the conveyance of the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers, and the Scott LaBonte/Entity Transfers are voidable in this action by the Trustee, the Trustee may recover judgment for the value of the assets transferred or the amount necessary to satisfy the Trustee's claim against Scott LaBonte, whichever is less, against (1) the first transferee of the asset or the person for whose benefit the transfer was made, including, but not limited to, the defendants, Sally LaBonte, Devcon, and RCZS, or (2) any subsequent transferee, including, but not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL, in connection with the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers.

### Fourth Claim for Relief (Alter Ego Against the Dynasty Trust)

146.    At all times relevant herein, Scott LaBonte exercised complete domination and control over the affairs, practices, decisions, assets and proceeds of the Dynasty Trust so that the Dynasty Trust had no separate mind, will or existence of its own.

147.    Scott LaBonte used such complete control and domination over the Dynasty Trust to further his to efforts to hinder, delay and default his creditors including the Trustee, and commit other frauds, wrongdoing, dishonesty, and unjust acts in contravention to the Trustee's legal rights and the legal rights of the Debtors' bankruptcy estate.

148.    Scott LaBonte's complete control and domination over the Dynasty Trust and breaches of duties proximately caused the injury and unjust loss suffered by the Trustee and the Debtors' bankruptcy estates.

34

149.    This Court should pierce the veil of the Dynasty Trust and determine it to be the alter ego of Scott LaBonte and hold the Dynasty Trust liable for the claims against Scott LaBonte including the claims held by the Trustee on behalf of the Debtors' bankruptcy estate.

### Fifth Claim for Relief (Intentional Fraudulent Transfer by the Dynasty Trust Pursuant to Conn. Gen. Stat. § 52-552e(a)(1))

150.    The Trustee held a claim against the Dynasty Trust, as the alter ego of Scott LaBonte, as that term is defined in Conn. Gen. Stat. § 52-552b(3) and such claim arose before the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers were made.

151.    Scott LaBonte and the Dynasty Trust, as the alter ego of Scott LaBonte, made the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers with the actual intent to hinder, delay or defraud their creditors including the Trustee.

152.    The Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers constitute fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(1).

153.    Pursuant to Conn. Gen. Stat. § 52-552h(a), the Trustee may obtain (1) the avoidance of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers to the extent necessary to satisfy the Trustee's claims against the Scott LaBonte and the Dynasty Trust; (2) an attachment or other provisional remedy against the assets transferred or other property of the transferees; (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure (A) an injunction against further disposition by the Dynasty Trust or the transferees, or both, of the assets transferred or of other property, (B) appointment of

35

a receiver to take charge of the assets transferred or of other property of the transferees, or (C) any other relief the circumstances may require.

154.    Pursuant to Conn. Gen. Stat. § 52-552i(b), to the extent that the conveyance of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers are voidable in this action by the Trustee, the Trustee may recover judgment for the value of the assets transferred or the amount necessary to satisfy the Trustee's claim against Scott LaBonte and the Dynasty Trust, whichever is less, against (1) the first transferee of the asset or the person for whose benefit the transfer was made, including, but not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL, or (2) any subsequent transferee.

**Fifth Claim for Relief (Constructive Fraudulent Transfer by the
Dynasty Trust Pursuant to Conn. Gen. Stat. § 52-552e(a)(2))**

155.    The Trustee held a claim against the Dynasty Trust, as the alter ego of Scott LaBonte, as that term is defined in Conn. Gen. Stat. § 52-552b(3), and such claim arose before the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers were made.

156.    The Dynasty Trust did not receive reasonably equivalent value in exchange for the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers.

157.    Scott LaBonte and the Dynasty Trust were insolvent at the time of or became insolvent as a result of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers.

36

158.    The Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers constitute fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(2).

159.    Pursuant to Conn. Gen. Stat. § 52-552h(a), the Trustee may obtain (1) the avoidance of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers to the extent necessary to satisfy the Trustee's claims against the Scott LaBonte and the Dynasty Trust; (2) an attachment or other provisional remedy against the assets transferred or other property of the transferees; (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure (A) an injunction against further disposition by the Dynasty Trust or the transferees, or both, of the assets transferred or of other property, (B) appointment of a receiver to take charge of the assets transferred or of other property of the transferees, or (C) any other relief the circumstances may require.

160.    Pursuant to Conn. Gen. Stat. § 52-552i(b), to the extent that the conveyance of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers are voidable in this action by the Trustee, the Trustee may recover judgment for the value of the assets transferred or the amount necessary to satisfy the Trustee's claim against Scott LaBonte and the Dynasty Trust, whichever is less, against (1) the first transferee of the asset or the person for whose benefit the transfer was made, including, but not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL, or (2) any subsequent transferee.

**Sixth Claim for Relief (Constructive Fraudulent Transfer by the Dynasty Trust Pursuant to Conn. Gen. Stat. § 52-552f(a))**

37

161.    The Trustee held a claim against the Dynasty Trust, as the alter ego of Scott

LaBonte, as that term is defined in Conn. Gen. Stat. § 52-552b(3) and such claim arose before

the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers were made.

162.    The Dynasty Trust did not receive reasonably equivalent value in exchange for

the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers.

163.    The Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity

Transfers were made at a time when (A) Scott LaBonte and the Dynasty Trust were engaged in,

or were about to engage in, a business or transaction for which the remaining assets of Scott

LaBonte and the Dynasty Trust were unreasonably small in relation to the business or

transaction; and/or (B) Scott LaBonte and the Dynasty Trust intended to incur, or believed or

reasonably should have believed that they would incur debts beyond their ability to pay as they

became due.

164.    The Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity

Transfersconstitute fraudulent transfers within the meaning of, and in violation of Conn. Gen.

Stat. § 52-552e(a)(2).

165.    Pursuant to Conn. Gen. Stat. § 52-552h(a), the Trustee may obtain (1) the

avoidance of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers

to the extent necessary to satisfy the Trustee's claims against the Scott LaBonte and the Dynasty

Trust; (2) an attachment or other provisional remedy against the assets transferred or other

property of the transferees; (3) subject to applicable principles of equity and in accordance with

applicable rules of civil procedure (A) an injunction against further disposition by the Dynasty

38

Trust or the transferees, or both, of the assets transferred or of other property, (B) appointment of a receiver to take charge of the assets transferred or of other property of the transferees, or (C) any other relief the circumstances may require.

166.    Pursuant to Conn. Gen. Stat. § 52-552i(b), to the extent that the conveyance of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers are voidable in this action by the Trustee, the Trustee may recover judgment for the value of the assets transferred or the amount necessary to satisfy the Trustee's claim against Scott LaBonte and the Dynasty Trust, whichever is less, against (1) the first transferee of the asset or the person for whose benefit the transfer was made, including, but not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL, or (2) any subsequent transferee.

**WHEREFORE**, the plaintiff, James Berman, Trustee, respectfully requests that this Court enter the following relief in favor of the Trustee and against the defendants as follows:

a.    The avoidance of the Scott LaBonte/Dynasty Trust Transfers, the Scott LaBonte/Sally LaBonte Transfers and the Scott LaBonte/Entity Transfers;

b.    The avoidance of the of the Dynasty Trust/Sally LaBonte Transfers and the Dynasty Trust/Entity Transfers;

c.    An attachment or other provisional remedy against the assets transferred or other property of the transferees;

d.    A temporary restraining order and preliminary and permanent injunctions against further disposition by the Scott LaBonte, the Dynasty Trust, and/or the transferees, of the assets transferred or of other property;

e.   The appointment of a receiver to take charge of the assets transferred or of other property of the transferees;

f.   Any other relief the circumstances may require;

g.   Judgment for the value of the assets transferred or the amount necessary to satisfy the Trustee's claims against Scott LaBonte and/or the Dynasty Trust, whichever is less, against (1) the first transferee of the asset or the person for whose benefit the transfer was made, including, but not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL, or (2) any subsequent transferee, including, but not limited to, the defendants, Sally LaBonte, Devcon, RCZS, and Marketplace PSL;

h.   Reasonable attorneys' fees;

i.   Pre-judgment interest;

j.   Costs; and

k.   Such other and further relief as the Court deems just and proper.

Dated at Bridgeport, Connecticut, this 31st day of May, 2014.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE SUBSTANTIVELY CONSOLIDATED
ESTATE OF MICHAEL S. GOLDBERG, LLC AND
MICHAEL S. GOLDBERG


By: */s/ Stephen M. Kindseth*
Stephen M. Kindseth
Patrick R. Linsey
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Tele: (203) 368-4234
Fax: (203) 367-9678
Email: skindseth@zeislaw.com
plinsey@zeislaw.com